IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | 2:19-CR-00381-MJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ARACELIS MARTINEZ NUNEZ, | ) | |
| | ) | |
| Defendant, | | |

**<u>Opinion and Order on Pretrial Motions</u>**

Defendant, Aracelis Martinez Nunez, is charged in a one-count superseding indictment with conspiracy to possess with intent to distribute and distribute five (5) kilograms or more of cocaine, in violation of 21 U.S.C. § 841.  (ECF No. 147).  Presently before the Court are the following pretrial motions filed by Ms. Nunez:  Motion to Suppress Evidence Seized After Detention (ECF No. 290); Motion to Compel 404(b) Materials (ECF No. 291); Motion to Compel Production of Favorable Evidence (ECF No. 292); Motion to Compel Production of Grand Jury Transcripts (ECF No. 293); Motion for Production of Jencks Material (ECF No. 294); and Motion to Preserve Rough Notes (ECF No. 295). The Government has filed a Response thereto (ECF No. 306), and Ms. Nunez has replied (ECF No. 311).  A suppression hearing was held on March 22, 2021.  Following consideration of the motions, briefs, testimony, and arguments of counsel, Ms. Nunez's Motions will be granted in part and denied part.

**I.     Motion to Suppress Evidence Seized After Detention (ECF No. 290)**

**A.  Relevant Background to Suppression Motion**

On or about November 20, 2019, Troopers Daniel Beatty and David Williams of the Pennsylvania State Police (PSP) received a tip from a "known individual" concerning a

suspicious GMC Acadia with a Colorado registration parked at a Days Inn located in

Monroeville, PA.  Acting on this tip, Troopers Beatty and Williams subsequently observed that

the GMC Acadia in the hotel parking lot.  Around 1100 that day, the troopers also observed a

black Honda Accord with an Indiana temporary registration tag. The Honda Accord was

occupied by three Hispanic males, later identified as Alvarado Llanes, Alvarado Felix, and

Zazueta Garcia, co-defendants in this case. At approximately 1125 hours, the Honda Accord left

the rear of the Days Inn parking lot.

 At approximately 1404 hours, Trooper Beatty observed Mr. Quintero Felix and Ms.

Nunez in the hotel lobby. Trooper Williams previously observed Ms. Nunez on hotel

surveillance.  At approximately 1407 hours, Trooper Beatty observed Ms. Nunez and Mr.

Quintero Felix exit the hotel and enter the driver's door of the GMC Acadia.   Ms. Nunez drove

the GMC Acadia to Denny's at 3980 William Penn Highway, where she and Mr. Quintero Felix

entered the restaurant.  At approximately 1421 hours, Trooper Beatty learned that the GMC

Acadia was owned by Selena P. Orozco of 7207 West Cheryl Drive, Peoria, Arizona.   At this

time, Trooper Beatty also discovered that Orozco is the subject of a narcotics investigation.  A

further investigation of the Acadia's vehicle history revealed the vehicle had been deemed a total

loss, a salvage title had been issued twice, and the title had been rebuilt and issued to Orozco.  At

the Suppression hearing, Trooper Beatty testified that, based upon his training and experience,

the circumstances of the Acadia's registration were consistent with tradecraft employed by drug

trafficking organizations.

 At approximately 1433 hours, electronic surveillance observed the Honda Accord at an

EZ storage facility where suspected drug trafficking activities occurred.  Troopers Beatty and

Williams observed the occupants of the Accord, later identified as Alvarado Llanes and Zazueta

Garcia, talking on their cell phones, looking around nervously, and generally acting suspicious. The Honda Accord left the facility at approximately 1455 hours. According to Trooper Beatty, "…the PSP had prior knowledge that this storage unit was associated with Martinez-Nunez and Felix."

At approximately 1455 hours, Ms. Nunez and Quintero Felix left Denny's and re-entered the GMC Acadia with Ms. Nunez once again driving. Ms. Nunez then parked in a Rite Aid parking lot at 3434 William Penn Highway.  She and Quintero Felix went into the Rite Aid, left the Rite Aid, and then went to a nearby Dollar Tree.  At approximately 1550 hours, Ms. Nunez and Quintero Felix left Dollar Tree.  Mr. Quintero Felix entered the driver's side of the GMC Arcadia, and they drove back to the hotel and went inside. At approximately 1738 hours, Ms. Nunez and Mr. Quintero Felix left their room and went to the lobby and spoke with hotel staff. A few minutes later, Ms. Nunez briefly went back to the room and returned to the lobby.

According to Trooper Beatty, Ms. Nunez and Mr. Quintero Felix appeared to be checking out one day earlier then their reservation. At approximately 1744 hours, Ms. Nunez entered the driver's side door of the GMC Acadia.  Ms. Nunez proceeded to drive as follows: a. She went through a AAA parking lot and turned left on SR 48.; b. Once reaching the intersection of Old William Penn Highway, Ms. Nunez made an abrupt U-turn and traveled in the opposite direction; c. The GMC Acadia then went past the Days Inn hotel they had been staying: d. The GMC Acadia often changed lanes without signaling and then changed lanes back to the original lane of travel; e. The GMC Acadia drove three blocks, turned around and traveled past the hotel again.   According to Trooper Beatty, Ms. Nunez's driving behavior is indicative of someone trying to "lose a tail."

At approximately 1810 hours, Ms. Nunez arrived at the Speedway gas station located at 4363 Broadway Blvd., Monroeville, Pennsylvania.  Ms. Nunez drove the vehicle around the parking lot, stopping once at a pump for large trucks and then moving to a different pump.   Mr. Quintero Felix then exited the vehicle and proceeded into the Speedway gas station building.  Mr. Quintero Felix returned a few minutes later and the vehicle moved 100 feet and parked on the edge of the traffic way, parallel to SR 130, facing south.   Trooper Beatty testified, based upon his training and experience, that these actions were for the purpose of surveilling the area.  At approximately 1817 hours, the Honda Accord was observed in a parking lot adjacent to the driveway of the Speedway gas station.  At approximately 1825 hours, the Honda Accord was observed entering the driveway of the Speedway gas station, then turning left on SR 48, and traveling in a northbound direction.  At approximately 1825 hours, the GMC Acadia changed position in the Speedway parking lot and moved to a parking stall, and Ms. Nunez and Mr. Quintero Felix entered the store.   At approximately 1832 hours, both exited the store, and Ms. Nunez entered the driver's side of the vehicle.  Law enforcement then observed that the vehicle drove normally but avoided a more direct highway route, and it exited I-376 and went up Market Place Blvd, then made an abrupt U-turn and went downhill the way it had come.  At approximately 1915 hours, law enforcement saw the Honda Accord park at the At Home store, 2000 Casteel Drive, Coraopolis, Pennsylvania, parking lot and all three occupants stayed in the vehicle. At approximately 1917 hours, the GMC Acadia entered the parking lot of a closed business, and Ms. Nunez and Mr. Quintero Felix exited the vehicle and changed driver positions so that Felix became the driver.  Felix started driving back the way the vehicle had come, and at approximately 1922 hours, the GMC Arcadia parked at the Pit Stop Airport Parking, across from the At Home Store. The GMC Acadia stopped in a location where the occupants could see the

4

Honda Accord, which was located in an area not designated for parking.  At approximately 1946

hours, the GMC Acadia started moving slowly towards the At Home store, but it stopped and

focused on a surveillance vehicle and then did a U-turn and left the At Home store.   At

approximately 1949 hours, the Honda Accord left the At Home store and merged onto I-376,

exited I-376, and then merged back onto I-376.   At approximately 1956 hours, the Honda

Accord entered the short-term parking lot of the Pittsburgh International Airport, then

immediately left that lot, and parked at the Sunoco gas station located near the airport. The three

occupants of the Honda Accord entered the gas station store and then returned to their vehicle

and remained in the Sunoco parking lot. At approximately 2025 hours, the Honda Accord left the

Sunoco gas station, entered the airport short-term parking lot, and then exited that lot with the

GMC Acadia following behind them. Both vehicles then entered the parking area of the airport.

The GMC Acadia was observed abruptly parking in the enclosed parking garage. Occupants of

both vehicles were then observed quickly unloading bags from the trunk of the GMC Arcadia,

placing them into the trunk of the Honda Accord.

At approximately 2048 hours, PSP approached and detained all occupants of the vehicles.

Ms. Nunez was standing behind the trunk of the Honda Accord. Ms. Nunez had placed her

pillow, a light-colored backpack and a cellular phone on top of the trunk of the Honda Accord.

She was placed in handcuffs and moved away from the other occupants. A narcotics detection

canine responded to the scene and conducted a canine sniff of both vehicles. The dog alerted on

both vehicles. The occupants were then transported to the Allegheny County Police station at the

airport. The vehicles were transported to an indoor garage at the airport.  A probable cause

search was then conducted on the vehicles. Approximately 14-kilogram sized blocks of

suspected cocaine were discovered in the GMC Acadia in a natural void which was modified and

accessed through the rear wheels of the vehicle. No illegal narcotics were located in the Honda Accord.

### B. Discussion

Ms. Nunez contends that all evidence seized as a result of her detention must be suppressed because police did not have reasonable suspicion to seize her. (ECF No. 290). Ms. Nunez maintains that no reasonable officer would examine these facts and determine that she was engaged in criminal activity and that her detention and the evidence seized thereafter violated her Fourth Amendment rights. The government contends that, under the totality of the circumstances, when combined with the agents training and experience, the agents had the requisite reasonable suspicion to approach and detain Ms. Nunez and her codefendants. (ECF No. 306 at pp. 4-13).

"'Generally, for a seizure [of a person] to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause.' But a police officer may arrest a person in a public place without a warrant if the officer possesses probable cause to believe the person committed a felony. Or, 'an officer may ... conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Torres*, 961 F.3d 618, 622 (3d Cir. 2020), *cert. denied*, No. 20-6216, 2020 WL 7132652 (U.S. Dec. 7, 2020) (internal citations omitted). In assessing reasonable suspicion, officers may draw on their specialized training to make inferences about the information available to them. *United States v. Thompson*, 772 F.3d 752, 758 (3d Cir. 2014). Moreover, unusual means of travel or strange behavior while travelling, even if legal, may give rise to reasonable suspicion, as may an unusual time and location of the stop. *See United States Sokolow*, 490 U.S. at 8-10, 109 S.Ct.

1581 (1989); *see Michigan v. Long*, 463 U.S. 1032, 1050, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

In evaluating the officer's actions, the Court must defer to the "officer's knowledge of the nature and nuances of the type of criminal activity the officer has observed." *United States v. Robertson*, 305 F.3d 164, 166 (3d Cir. 2002) (citing *United States v. Nelson*, 284 F.3d 472 (3d Cir. 2002)). In addition, the Third Circuit has given considerable deference to police officers' determinations of reasonable suspicion. *See, e.g., Nelson*, 284 F.3d at 482. Similarly, courts often defer to personal observations and conclusions on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Boxley*, No. CR 17-177, 2019 WL 6828393, at *7 (W.D. Pa. Dec. 13, 2019).

Here, Ms. Nunez maintains that, at the time the police detained her, they only knew the following:

1. She left one day early from her planned stay at the Days Inn hotel;

2. For a limited period of time she drove a GMC Acadia that was suspected of being involved in drug transactions;

3. For a portion of the time that she was driving, she appeared to drive erratically;

4. She moved some of her belongings from the GMC Acadia to the black Honda Accord in the airport parking lot.

(ECF No. 311 at p. 3). However, as established through Trooper Beatty's testimony, the police knew much more about Ms. Nunez wherein they could articulate a reasonable suspicion of criminal activity. First, she was driving a vehicle, a GMC Acadia with a Colorado registration, that had been reported as suspicious and parked at a Days Inn in Monroeville. Second, during the course of Trooper Beatty and Trooper Williams investigation, the GMC Acadia, driven by

Ms. Nunez, was seen closely associated with another vehicle, a Honda Accord, bearing an Indiana temporary registration plate at the same Days Inn hotel parking lot.  These vehicles, when surveilled, were seen driving to the same locations, at the same times, and in similarly peculiar manners.  The Honda Accord had also been observed at a storage facility where drug trafficking activities were suspected.  Third, upon receiving information regarding the registered owner of the GMC Acadia, the troopers learned several things about the GMC Acadia that, when taken together with their training and experience, led the troopers to believe that the vehicle was being used to traffic narcotics.  According to Trooper Beatty, the circumstances relating to the GMC Acadia's registration are consistent with tradecraft employed by drug trafficking organizations to be used in the smuggling of narcotics into and across the U.S., particularly in the smuggling of narcotics from Mexico to the U.S. The awareness of these circumstances contributed to the trooper's reasonable suspicion that Ms. Martinez Nunez and Mr. Quintero Felix were utilizing the GMC Acadia in furtherance of narcotics trafficking. Fourth, after a surveillance operation that continued over several hours, the GMC Acadia and Honda Accord drove their separate ways, however, they both concurrently showed up at three different locations at the approximate same time. Based on the training and experience of the agents, they believed the occupants of both vehicles were casing different locations in order to execute an exchange of contraband and were conducting driving maneuvers to conduct countersurveillance designed to detect law enforcement.  Finally, at the culmination of the covert surveillance operation, investigators observed the vehicles abruptly park in an enclosed parking garage in close proximity to each other. Subsequently, investigators observed the vehicle occupants exchange multiple bags and items of luggage. Specifically, all individuals were quickly

removing the items of property from the GMC Acadia and immediately placing them into the trunk of the Honda Accord.

When the factors are viewed together, from the troopers' point of view, combined with their training and experience, they establish the requisite reasonable suspicion to approach Ms. Martinez Nunez and to briefly detain her (and the other codefendants) in order to investigate further. After doing so, they properly seized fourteen kilograms of cocaine. Therefore, under these circumstances, the detention and search of Ms. Nunez and the GMC Acadia were proper.

Accordingly, Ms. Nunez's Motion to Suppress will be denied.

## II.     Motion to Compel 404(b) Materials (ECF No. 291)

Ms. Nunez moves the Court to order the government to produce any and all materials related to Fed. R. Evid. 404(b) including Fed. R. Evid. 609 and/or Fed. R. 807 at least thirty (30) days prior to the commencement of trial. (ECF No. 291). The government maintains that it is has not yet identified specific bad act(s) by Ms. Nunez and/or her codefendants that it will seek to introduce at trial. (ECF No. 306 at pp. 13-17). The government has also acknowledged the requirements under Rule 404(b), Rule 609, and Rule 807 to provide notice and will do so at least two weeks prior to trial.

### A.  Rule 404(b)

Federal Rule of Evidence 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence of prior bad acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of

accident." Fed. R. Evid. 404(b)(2). Rule 404(b)'s notice requirements, which were amended

effective December 1, 2020, provide as follows:

> (3) Notice in a Criminal Case. In a criminal case the prosecutor must:
>
> (A) provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it;
>
> (B) articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose; and
>
> (C) do so in writing before trial – or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b)(3). What constitutes "reasonable notice" depends on "the circumstances and

complexity of the prosecution." *United States v. Johnson*, 218 F. Supp. 3d 454, 462 (W.D. Pa.

2016). In general, courts have found that what constitutes "reasonable notice" under Rule 404(b)

is in the range of seven to ten days or one to two weeks prior to trial. *United States v. Long-*

*Parham*, 183 F. Supp. 3d 746, 750 (W.D. Pa. 2016); *United States v. Buckner*, 2020 U.S. Dist.

LEXIS 5485, at *14–15, 2020 WL 211403 (M.D. Pa. Jan. 13, 2020).

Here, the Court finds no basis to order the government to provide Rule 404(b) evidence

any earlier than fourteen days prior to trial. However, as trial in this matter has yet to be

scheduled, the Court cannot provide a date certain for the government to provide notice to Ms.

Nunez. If the parties cannot otherwise agree on a disclosure timetable regarding said evidence,

the Court shall order the same upon request of the defendant. Accordingly, Ms. Nunez's Motion

to Compel Rule 404(b) Evidence will be denied, as premature.

**B. Rule 609**

Rule 609, Impeachment by Evidence of a Criminal Conviction, sets forth rules which

apply to "attacking a witness's character for truthfulness by evidence of a criminal conviction."

Fed. R. Evid. 609(a). Although Rule 609(b) provides that if more than ten years have passed

since the witness's conviction or release from confinement, whichever is later, the party seeking

to introduce the evidence of the conviction must "give[ ] an adverse party reasonable written

notice of the intent to use it so that the party has a fair opportunity to contest its use," the text of

Rule 609(a) provides no such notice requirement. As a result, "the court can only order the

government to provide advanced written notice of its intent to proffer any Rule 609(b)

evidence," but not of Rule 609(a) evidence. *See United States v. Beech*, 307 F.R.D. 437, 443

(W.D. Pa. 2015).

Here, the government again asserts that it is aware of the notice requirements of Rule 609

and that, pursuant to Fed. R. Crim. P. 16(a)(1)(D), it has provided Ms. Nunez with a copy of her

criminal history.  The Court will order that, to the extent the Government is aware of any

evidence which falls within the ambit of Rule 609(b), it shall provide notice of its intent to use

such evidence at the same time it provides notice under Rule 404(b) as provided by further order

of court.  However, as trial in this matter has yet to be scheduled, the Court cannot provide a date

certain for the government to provide notice to Ms. Nunez.  If the parties cannot otherwise agree

on a disclosure timetable regarding said evidence, the Court shall order the same upon request of

the defendant.

Accordingly, Ms. Nunez's Motion to Compel Rule 609 Evidence will be denied, as

premature.

### C.  Rule 807

Pursuant to Fed. R. Evid. 807, the "residual exception" rule:

> (a) In General. Under the following conditions, a hearsay statement is not
> excluded by the rule against hearsay even if the statement is not
> admissible under a hearsay exception in Rule 803 or 804:

(1) the statement is supported by sufficient guarantees of trustworthiness-after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

(b) Notice. The statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement--including its substance and the declarant's name--so that the party has a fair opportunity to meet it. The notice must be provided in writing before the trial or hearing--or in any form during the trial or hearing if the court, for good cause, excuses a lack of earlier notice.

Fed. R. Evid. 807. The Third Circuit has explained that "'[t]he residual hearsay exception is to be used only rarely, and in exceptional circumstances, and is meant to apply only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present.'" *United States v. Lawrence*, 349 F.3d 109, 117 (3d Cir. 2003) (quoting *Bohler-Uddeholm Am., Inc. v. Ellwood Gp., Inc.*, 247 F.3d 79, 112 (3d Cir. 2001)).

With respect to recent modifications to Rule 807, the Advisory Committee has explained that:

The notice provision has been amended to make four changes in the operation of the rule:

• First, the amendment requires the proponent to disclose the "substance" of the statement. This term is intended to require a description that is sufficiently specific under the circumstances to allow the opponent a fair opportunity to meet the evidence. *See* Rule 103(a)(2) (requiring the party making an offer of proof to inform the court of the "substance" of the evidence).

• Second, the prior requirement that the declarant's address must be disclosed has been deleted. That requirement was nonsensical when the declarant was unavailable, and unnecessary in the many cases in which the declarant's address was known or easily obtainable. If prior disclosure of the declarant's address is critical and cannot be obtained by the opponent through other means, then the opponent can seek relief from the court.

• Third, the amendment requires that the pretrial notice be in writing--which is satisfied by notice in electronic form. *See* Rule 101(b)(6). Requiring the

12

notice to be in writing provides certainty and reduces arguments about whether notice was actually provided.

• Finally, the pretrial notice provision has been amended to provide for a good cause exception. Most courts have applied a good cause exception under Rule 807 even though the rule in its current form does not provide for it, while some courts have read the rule as it was written. Experience under the residual exception has shown that a good cause exception is necessary in certain limited situations. For example, the proponent may not become aware of the existence of the hearsay statement until after the trial begins, or the proponent may plan to call a witness who without warning becomes unavailable during trial, and the proponent might then need to resort to residual hearsay.

The rule retains the requirement that the opponent receive notice in a way that provides a fair opportunity to meet the evidence. When notice is provided during trial after a finding of good cause, the court may need to consider protective measures, such as a continuance, to assure that the opponent is not prejudiced.

Fed.R.Evid. 807 advisory committee's note to 2019 amendments.

Here again, to the extent that the government is aware of any information responsive to the Ms. Nunez's request pursuant to Rule 807 which has not already been provided to the defendant, the Court will order the government to provide written notice of the intent to offer any statement pursuant to Rule 807.  However, as trial in this matter has yet to be scheduled, the Court cannot provide a date certain for the government to provide notice under Rule 807 to Ms. Nunez.  If the parties cannot otherwise agree on a disclosure timetable regarding said evidence, the Court shall order the same upon request of the defendant.  Accordingly, Ms. Nunez's Motion to Compel Rule 807 Evidence will be denied, as premature.

### III.    Motion to Compel Production of Favorable Evidence (ECF No. 292)

Ms. Nunez next moves for the disclosure of favorable evidence, plea bargains, preferential treatment, and promises to government witnesses.  (ECF No. 292).  Specifically, Ms. Nunez requests 1) records of prior convictions for government witnesses; 2) prior misconduct or bad acts of the government's witnesses (including agents); 3) promises of consideration given to

13

government witnesses; 4) threats or coercion applies toward government witnesses; 5) prior

testimony offered by government witnesses; 6) the existence and identification of each witness

who was or is an informant, accomplice, coconspirator or expert that has testified before any

court, grand jury, etc.; 7) personnel files, including internal investigation or public integrity files

for government agent witnesses; 8) any and all other records which could be helpful in

impeaching government witnesses; 9) records of drug abuse or treatment of government

witnesses; 10) records relating to law enforcement assistance for cooperating informants, etc.;

11) financial compensation paid to cooperating informants; 12) the same information set forth in

1-11 for non-witness declarants whose statements are being offered as evidence; and 13) the

identity of all government witnesses who may be called at trial.

### A.    Items 1-4: 7-12

The government contends that production of the information set forth in Items 1-4 and 7-

12 is not required at this stage of the proceedings in this case. (ECF No. 306 at pp. 18-19). In

*Giglio v. United States*, 405 U.S. 150, 154 (1972), the Supreme Court extended its ruling in

*Brady v. Maryland*, 373 U.S. 83 (1963) to encompass impeachment evidence relating to the

credibility of a government witness. *See also United States v. Perdomo*, 929 F.2d 967 (3d Cir.

1991). Any inducements or rewards given to government witnesses, including but not limited to

money, grants of immunity, plea bargains, promises of leniency or recommendations thereof, or

preferential treatment, would fall under impeachment evidence that must be disclosed under

*Brady*. *See United States v. Higgs*, 713 F.2d 39,43(3d Cir. 1983). ("Evidence that government

witnesses have been granted immunity and/or leniency for their cooperation is clearly relevant

on the issue of their credibility").

The government acknowledges its continuing obligation under *Brady* and *Giglio* to provide Ms. Nunez with exculpatory material and impeachment materials. There is no indication that the government has not met its obligations under *Brady* and *Giglio.* Thus, the government shall provide *Giglio* and/or *Brady* material in sufficient time for its effective use at trial so that it will not result in a delay of the trial or delay during the trial. Therefore, the Motion for production of exculpatory material and/impeachment material, pursuant to *Brady* and *Giglio*, is denied, without prejudice.

### B.    Items 5 and 6

In Items 5-6, Ms. Nunez requests production of prior testimony of government witnesses and the existence and identification of each witness who was or is an informant, accomplice, co-conspirator or expert that has testified before any court, grand jury, etc. As to Item 5, the government submits that the production of prior testimony by a government witness is governed by the Jencks Act. (ECF No. 306 at p. 19).   Pursuant to prevailing law, disclosure of such material is not required at this stage. "Rule 16(a) does not require the discovery of witness statements." *United States v. Kenny*, 462 F.2d 1205, 1212 (3d Cir. 1972).  Under Fed. R. Crim. P. 16(a)(2), statements made by prospective government witnesses are specifically exempted from Rule 16's disclosure requirements. Production of such statements is governed, instead, by the Jencks Act, 18 U.S.C. § 3500, which requires the government to provide the defense with statements of witnesses that the government intends to call at trial. The Jencks Act, however, protects discovery of such witness statements "until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a); *see also United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994); *United States v. Horsley*, 621 F. Supp. 1060, 1067-68 (W.D.Pa. 1985). Moreover, the Third Circuit has repeatedly held that a district court cannot compel the

government to disclose statements of its witnesses before the conclusion of their direct examination, and that ordering early disclosure of such information constitutes an abuse of discretion or even reversible error. *See United States v. Higgs*, 713 F.2d 39, 44-45 (3d Cir. 1983). (internal citations omitted).

Pursuant to the foregoing authority, the disclosure of witness statements at this early stage is not required.  The Court though notes that the government acknowledges that strict adherence to the dictates of the Jencks Act could result in delay at trial. The government, therefore, has indicated that it will voluntarily turn over Jencks Act materials to the defendant at some point prior to trial in this case to avoid unnecessary delays or interruptions.   Accordingly, Ms. Nunez's Item 5 request is denied.

As to Item 6, Ms. Nunez requests production of witnesses and the existence and identification of each witness who was or is an informant, accomplice, co-conspirator or expert that has testified before any court, grand jury, etc.  The government contends it is not required to identify its witnesses at this stage.  (ECF No. 306 at pp. 19-22).  Moreover, to the extent that the defendant seeks information about witnesses who may not even testify at trial, the government maintains it is not required to provide the defendant with all of the details of its investigation or the names of non-testifying witnesses who aided in its investigation.

Effective law enforcement and the protection of the public interest require that the government be permitted, absent exigent circumstances, to withhold the identity of informants. *See Roviaro v. United States*, 353 U.S. 53, 60 (1957) ; *United States v. Cadet*, 727 F.2d 1453, 1469 (9th Cir. 1984) (abuse of discretion to order government to provide statements of witnesses that it did not intend to call at trial); *United States v. Cole*, 453 F.2d 902, 905 (8th Cir. 1972); *United States v. Vastola*, 670 F. Supp. 1244, 1268 (D.N.J. 1987). The government's privilege

will give way only if the defense can make an adequate showing that disclosure is "relevant and helpful to the defense of an accused" or "essential to a fair determination of a cause." *Roviaro*, 353 U.S. at 60-61. The defendant bears the burden of setting forth a specific need for disclosure. *United States v. Jiles*, 658 F.2d 194, 197 (3d Cir. 1981); accord *Pickel v. United States*, 746 F.2d 176, 181 (3d Cir. 1984) ("The individual seeking disclosure has the burden of establishing the significance of the informant's testimony."). This burden is an exacting one. Mere speculation that disclosure would be helpful is not sufficient to override the government's privilege. *Jiles*, 658 F.2d at 197 ("[Defendant's] first reason, that as an eyewitness the informant may provide exculpatory information, is clearly not enough . . . The mere speculation that an eyewitness may have some evidence helpful to the defendant's case is not sufficient to show the specific need required by Roviaro."); *United States v. Bazzano*, 712 F.2d 826, 839 (3d Cir. 1983) (en banc) (same). Thus, a defendant must make a particularized showing that the informant can provide material evidence that aids the defendant in establishing a specific asserted defense. Absent such an affirmative showing, courts have repeatedly refused to compel the government to disclose an informant's identity. *See, e.g., Pickel*, 746 F.2d at 181 (defendants advanced "nothing more than speculation" and "have not met their burden"); *Jiles*, 658 F.2d at 197 (same); *Bazzano*, 712 F.2d at 839 (same).

Here, Mr. Nunez's motion does not articulate any particularized need for requested disclosure in Item 6. Pursuant to the foregoing authority, therefore, the defendant's request for information concerning the government's non-testifying witnesses will be denied.

C.    Item 13

As to Item 13, the government maintains that it is, as a general matter, not required to disclose to the defendant a list of its witnesses.  (ECF No. 306 at pp.  22). The Third Circuit has

held that "the [criminal] discovery rules do not permit the defense to get the names of witnesses." *United States v. Mitchell*, 540 F.2d 1163, 1166 (3d Cir. 1977) (citing Fed. R. Crim. P. 16 and citing U*nited States v. Addonizio*, 451 F.2d 49, 62 (3d Cir. 1972), cert. denied, 405 U.S. 936 (1972)); s*ee also Addonizio*, 451 F.2d at 62 ("in no event is the government required to divulge the identity of its witnesses in a noncapital case"); *United States v. Tarnai*, No. 2:11cr254, 2012 WL 5948855, at *2 (W.D.Pa. Nov. 28, 2012) (internal citations omitted) (a defendant is not "entitled to obtain a list of the government's witnesses through discovery").

Given the above-cited authority, the Court has no basis to order the government to comply with the defendant's request for the names of the government's witnesses. Accordingly, the Court will deny Ms. Nunez's request for Item 13.

### IV.    Motion to Compel Production of Grand Jury Transcripts (ECF No. 293)

Ms. Nunez next moves to compel the production of grand jury testimony.   (ECF No. 293).  Specifically, she contends that grand jury testimony is needed to develop the defense trial strategy and affirmative defenses, identify potential defense witnesses, and cross-examine government witnesses.   Further, she argues that the information presented to the grand jury by the government did not rise to a sufficient level to establish probable cause to indict Ms. Nunez, and the transcripts must be released in order for Ms. Nunez to challenge this determination to avoid another possible injustice. The government argues the transcripts are protected by an "obligation of secrecy" under Federal Rule of Criminal Procedure 6(e). (ECF No. 306 at p. 22-25). The government also maintains that the obligation of secrecy can be overcome only certain rare and limited circumstances, none of which apply in this case at this time.

As a matter of public policy, grand jury proceedings generally must remain secret except where there is a compelling necessity." *United States v. McDowell*, 888 F.2d 285, 289 (3d Cir.

1989).  A defendant may be entitled to review grand jury testimony after a witness "testified on direct examination at trial if their grand jury testimony was related to the subject matter of their trial testimony." *United States v. Jackson*, 363 F. App'x 159, 161 (3d Cir. 2010) (citing 18 U.S.C. § 3500(e); *United States v. Wong*, 78 F.3d 73, 83 (2d Cir. 1996); and *United States v. Budzanoski*, 462 F.2d 443, 454 (3d Cir. 1972)). In addition, Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) provides that "[t]he court may authorize disclosure - at a time, in a manner, and subject to any other condition that it directs - of a grand jury matter: (ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. Proc. 6(e)(3)(E)(ii). Finally, "[t]o support a motion for a judicially ordered disclosure of grand jury testimony, a party must show a particularized need for that information which outweighs the public interest in secrecy." *McDowell*, 888 F.2d at 289 (citing, *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 683 (1957));  *see also United States v. Slade*, No. 12-0367, 2013 WL 5873576, at *5 (E.D. Pa. July 3, 2013) (finding that a request for grand jury materials premised on the need to prepare a defense is not a proper basis to overcome the secrecy afforded to such materials); *United States v. Reliford*, No. 11-20158, 2011 WL 2144216, at *1 (E.D. Mich. May 31, 2011) (explaining that a defendant fails to meet its heavy burden to acquire grand jury transcripts where the defendant merely asserts that absent transcripts "the defense cannot adequately prepare a defense and cross-examine.").

Here, the law is clear that Ms. Nunez is not entitled to any disclosure of grand jury transcripts until after a grand jury witness testifies on direct examination. While a district court has discretion to order such disclosure earlier, the defendant must make a particularized need for such information, which Ms. Nunez has failed to do.  Her contention that the grand jury

testimony is needed to develop the defense trial strategy and affirmative defenses, identify

potential defense witnesses, and cross-examine government witnesses are insufficient bases for

compelling the disclosure of grand jury testimony.   Likewise, with regard to her contention that

the information presented to the grand jury by the government did not rise to a sufficient level to

establish probable cause to indict,  Ms. Nunez offers no particularized reason to support that

probable cause was not established.  For these reasons, the Court will deny Defendant's motion

to compel production of grand jury transcripts.

### V.      Motion for Production of Jencks Material (ECF No. 294)

Ms. Nunez next moves for early disclosure of all "Jencks Act" material. (ECF No. 294).

In particular, Ms. Nunez requests that the Court direct the Government to produce any and all

Jencks material at least thirty (30) days prior to trial.  Ms. Nunez argues that due process and

effective assistance of counsel necessitates the timely production of such materials.  The

government contends that production of Jencks material is not required at this stage of the

proceeding; however, the government maintains that, rather than to strict adherence to the Jencks

Act's requirements, it is amenable to producing  Jencks materials prior to trial. (ECF No. 306 at

p. 25).

Under the Jencks Act, no statement or report made by a government witness or potential

government witness "shall be the subject of subpoena, discovery, or inspection until said witness

has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). Upon motion of

the defendant, "[a]fter a witness called by the United States has testified on direct examination,

the court shall[…] order the government to produce any statement of the witness, which relates

to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b).

A plain reading of the statute demonstrates that the Court cannot order the government to provide investigative statements before a witness has testified on direct examination at trial. At best, this Court can encourage the government to provide Jencks materials earlier to avoid any delays during trial. The Court notes that a trial of this matter may involve multiple defendants; therefore in order not to delay trial, the government and the defense's cooperation will ensure the smooth flow of the trial. Accordingly, the Court, having no power to order the production of Jencks material prior to trial, Ms. Nunez's Motion seeking early disclosure of Jencks material will be denied.

## VI.      Motion to Preserve Rough Notes (ECF No. 295)

Finally, Ms. Nunez moves for the government to preserve its agents' rough notes. (ECF No. 295). The government responds that it is aware of its obligations under *United States v. Ammar*, 714 F.2d 238, 259 (3d Cir. 1983), *United States v. Vella*, 562 F.2d 275, 276 (3d Cir. 1977), and *United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994). (ECF No. 306 at p. 26). The government, therefore, does not object to preserving the rough notes of the federal agents and task force officers involved in this case. As acknowledged by the government, the above-cited cases require the government's agents to preserve rough notes created during an investigation.

Accordingly, Ms. Nunez's Motion to Preserve Rough Notes will be granted.

ORDER

Upon consideration of Ms. Nunez's Motion to Suppress Evidence Seized After Detention (ECF No. 290); Motion to Compel 404(b) Materials (ECF No. 291); Motion to Compel Production of Favorable Evidence (ECF No. 292); Motion to Compel Production of Grand Jury Transcripts (ECF No. 293), Motion for Production of Jencks Material (ECF No. 294), Motion to Preserve Rough Notes (ECF No. 295), the Government's Response thereto (ECF No. 306), Ms. Nunez's

Reply (ECF No. 311), the testimony received at the March 22, 2021 suppression hearing, and the arguments of counsel, it is hereby ordered as follows:

1. Ms. Nunez's Motion to Suppress Evidence Seized After Detention (ECF No. 290) is denied;

2. Ms. Nunez's Motion to Compel 404(b) Materials (ECF No. 291) is denied as premature;

3. Ms. Nunez's Motion to Compel Favorable Evidence (ECF No. 292) is denied as premature;

4. Ms. Nunez's Motion to Compel Production of Grand Jury Transcripts (ECF No. 293) is denied;

5. Ms. Nunez's Motion for Production of Jencks Material (ECF No. 294) is denied;

6. Ms. Nunez's Motion to Preserve Rough Notes (ECF No. 295) is granted.

DATED this 15th day of April, 2021.

BY THE COURT:

Marilyn J. Horan
United States District Judge

22